v. Nalco Company 15-1895. Mr. Shield, so you reserved four minutes for rebuttal, is that correct? Yes, sir. You've got 15 minutes, four minutes for rebuttal. You may proceed, sir. May it please the Court. The Board's conclusions that the claims of the 943 patent are obvious is not supported by substantial evidence or the law. Although Baker believes that each of the issues briefed supports reversing the Board's conclusions, we plan to focus on three issues today in addition to any questions the panel may have. Specifically, the Board's overly broad construction of emulsion and lowering the pH of the wash water. In the red brief, Nalco asserts that Baker Hughes never raised its claimed construction arguments with the Board. And in response, in the gray brief, you list JA sites at page 3 that total 107 pages where you assert you did challenge the, quote, erroneous instructions. Would you point me to a specific language within those 107 pages? Yes, Your Honor. For example, at A03619-20, specifically at page 16 of the comments responding to the action closing prosecution, Baker described that an emulsion in terms of the 943 patent required about 5% wash water to be dispersed and crudel using a mixing valve. At page 17 of the same response to the action closing prosecution, Baker said that an aqueous solution in crude oil mixture does not equal wash water in crude oil emulsions as the patent. Similarly, in the comments and revised amendments at A03877-78 and A03879, the same arguments were made. In the appellant's brief to the Board at page 9, A04374, Baker once again talked about that a mixture of oil and water does not necessarily equal an emulsion. In the rebuttal brief to the Board at A04615, page 5 of that brief, Baker was clear that the examiner is using faulty logic, that just because all emulsions are a mixture of emiscible liquids doesn't mean every mixture of emiscible liquids is emulsion. Do you concede, well you admitted that two of the examiner's statements were true, namely emulsions are a mixture of two emiscible liquids and water and crude oil are emiscible liquids. Yes, but just because you have water and crude oil together doesn't mean it's an emulsion. You can have water and crude oil mixed without creating an emulsion, and that's the issue there. Just because emulsions are a mixture of emiscible liquids doesn't mean all mixtures of emiscible liquids are emulsions. And Baker was clear that that was faulty logic on the part of the examiner. What about your lowering the pH construction? Going first to the October 3, 2011 response to office action, at A03552, page 11, Baker was clear that lowering the pH of the wash water is not equivalent to adjusting the pH. At 0326061, Baker talked about that there are two steps, distinct steps. First, you add the acid composition to the wash water, lower the pH to 6 or below, and then the wash water is added to the crude oil and an emulsion is created. Baker made similar arguments at A063622-23, A03881-82, and A04383, for example. Where in the record did you object to the reliance on Wikipedia before the PTAB? The Baker objected to the construction that the PTAB used that all emulsions, all mixtures of emiscible liquids were emulsions, and said it was faulty logic. There wasn't a specific discussion on Wikipedia. So there wasn't a specific objection? There wasn't a specific discussion that Wikipedia is unreliable. The examiner's constructions, as talked about in our briefs, they said one thing about that all mixtures of emiscible liquids were emulsions, and then the examiner says, well, Reynolds doesn't really have an emulsion. So what he's talking about is two emulsions. So the board didn't actually ever articulate one construction. They had a compounding error of constructions that started with Wikipedia, and then to justify the use of Reynolds, they're like, well, there's two types of emulsions talked about in Reynolds, but Reynolds only discusses that there should be no emulsions. The board miscites the examiner talking about the two types of emulsions, one being easily settled by just resting overnight, which the board says there's a temporary emulsion, and it cuts out the examiner's language describing what that was, and then there's a second type of emulsion that's intimately and thoroughly mixed. You have to use an electrostatic coalescence. So the board's error didn't start or finish with Wikipedia. It started there, but it continued on as they tried to justify the improper use of Wikipedia. Do you agree that if there was like a chemistry text or a dictionary that isn't modified continually like Wikipedia, if there was something like that that had that same definition in it, that that would be something that the board could have relied on? In a general sense, the board can rely on technical dictionaries and so forth and chemistry dictionaries for what an emulsion is, but you still have to be reasonable in light of what the specification is. I agree with you, but I just want to make sure that you're not saying that they couldn't rely on— No, I'm not saying that. It's more that Wikipedia itself, as one court observed, it's not good for technical issues. I see it as being a minor part of your argument, and the most important part of your argument that you need to succeed here is that it needs a little bit of different meaning than what's in the Wikipedia definition based in light of the specification. That's your real argument that you're going to succeed, right? Yes, Wikipedia is a red herring. Secondly, the board unreasonably expanded the scope of the transitional language consisting of to capture art that should never have been considered. Finally, the issue we want to cover is the secondary considerations of non-obviousness. Before you get to that, can you discuss the combining of patent owner admissions and kickoff? Yes, what would you like to know about that? Well, I assume you're saying that there's no substantial evidence to support that finding. Correct, and the issue there is if you look at the patent owner's admissions, there are four statements, most of which are partial statements. The last one of the four statements identified by the board goes on for four pages after the portion they snip out of it. But there's 119 pages of testimony from the inventor. There are four statements taken out of context, snipped, and there's nothing in the record to explain how one skilled in the art would know to pick those four statements and ignore all the other statements by the inventor. Similarly, Hickok teaches a method of adding metals to gasoline, which can include peroxides and oxidation. It doesn't have wash water. It doesn't have emulsions. It doesn't happen in a salter. And gasoline, as even was admitted by the board, is a refined hydrocarbon. It's not crude oil. As the inventor testified in the testimony that wasn't conserved by the board or mentioned, crude oil is a mixture of thousands of chemicals. You can't understand how it's going to react until it's tested. So when you put that together, Hickok, the only thing they pull out of it, they ignore pretty much the entire description of Hickok and pull an acid out. And then they say the inventor's statements during a preliminary injunction hearing, years after the fact, can then be mixed with this random acid, picked for something that's not analogous art, to come up with a new invention or a new disclosure of obviousness. But there's nothing in the record to explain why a person of skill in the art would make that combination. Also, I know the inventor's statements don't talk about the particular range of a pH or 6 below. Does Hickok disclose that? Hickok doesn't disclose pH at all. Hickok doesn't mention pH, emulsions, wash waters, desalters. I'm not even sure it mentions crude oil because it talks about refined motor oils and motor fuels. So turning to the claim construction issues, I believe we've already talked about emulsion, but going to the lowering the pH of the wash water, there are two distinct steps. And the steps require that the wash water pH be lowered before, after, or during the adding of the acid composition. And the acid composition in the wash water is then added to the crude oil to create an emulsion. The board's construction removes wash water from two places. First, the board's construction, which reads lowering the pH of the wash water at 6 or below, before, during, or after adding the hydroxy acid to the water. It removes wash water there. And if you look at the 943 patent, it describes that the solvent you can put your acid in can be water, can be alcohol, it can be other things. So by removing wash water, which has a specific meaning of refinery desalting, the board skews the scope of the patent a little bit. But the board goes further to say that you add the hydroxy acid aqueous composition to the crude oil to create an emulsion. They completely remove the wash water. By doing that, they then bring in HART, which adds the acid composition directly to the oil. In the original prosecution, the Winn Declaration describes that the invention works better because the acid is added to the wash water and not directly to the oil, and that they actually tested adding the acid to the oil as opposed to the wash water. So by removing wash water from the construction, the board ensnares HART, which goes against the teachings of the invention, going back to the original prosecution. And also they use it to justify bringing in HECOC, which is about treating gasoline, which doesn't have wash water, but it does have a solution you put the acid in. And so by removing wash water completely from the scope of the language, the board drastically changes the scope of the invention to ensnare HART that shouldn't have been considered. The consisting of, we've talked about a little bit, is closed language. And because of that, the prior art has to actually disclose the invention being discussed, not the invention plus a bunch of other items that may or may not be part of the invention. In this case, because the board basically equated consisting of to comprising of, the board felt there was no need to explain how you would know which of the two or which elements to pick from the various pieces of prior art. HART, for example, has a pH range that's 6 to 11, which is above the operating range of the claimed invention. HECOC uses gasoline. Reynolds doesn't create emulsions. When you start looking at all the different things that are in each of the pieces, you can come up to 25 to 30 different elements that may or may not be in the various pieces. But just to be fair, you should probably be talking about Reynolds in view of HART. Yes, Reynolds in view of HART. Because Reynolds in view of HART, the specific issue there is that Reynolds teaches against using emulsions, and HART specifically has emulsions. Both of them use a pH range that's substantially higher than the operating range of the claimed invention. The Reynolds and HART, because one is teaching to use emulsions and one is teaching away from emulsions, the board never explains how one would combine those two. Teaching away, that's a factual issue, right? Yes. So we need to review that for substantial evidence? Correct. But there is no evidence to show that a person of ordinary skill would take a reference that doesn't use emulsions and mix it with a reference that does. The Reynolds, when you look at it, says all emulsions should be avoided. It doesn't expressly say that. It says emulsions should be avoided because they interfere with the separation. And then there's discussion about higher pHs. But the Reynolds operating range is from 5 to 9 preferably. Most of the operating range is above 6, or above 7 actually, into an alkaline range. So pH isn't an issue in Reynolds when you look at it. pH is an issue for the claimed invention. That's why it has to be 6 or below. And so ignoring the parts of Reynolds, for example, and Hart that teach away from the invention and putting them together, there's no explanation of how you know which pieces to pick and which ones to ignore. There's nothing in the record to describe that. There is no substantial evidence supporting the board's conclusions. You're into your rebuttal time. I'm sorry. Okay. Thank you. Mr. Poradek? Yes. Did I pronounce that correctly? It's Poradek. I respond to any variation of that. I'll say Poradek. I don't even notice anymore, but thank you, Your Honor, for asking. Your Honor, Judge Stoll, you talked about the reference here that probably is the quickest path to some kind of an affirmance would be the Reynolds plus Hart combination because both of those independently teach adding hydroxy acid to a crude oil in order to resolve the metal. Do they teach achieving a certain pH level? Yes. I think Reynolds is our best reference on that. There's a number of different places, but Reynolds itself in Column 3 talks about the preferable pH level being 6. It talks about that pH level can be down to 2. So it's teaching 6 as its preference, and it actually says, very pertinent here, one reason you want to be careful not to make your emulsion too base is that it can lead to an emulsion that is hard to separate. So much of their argument on Reynolds is around that one sentence, and we might as well take a look at it. It's in Column 3. This is on A2745. As discussed previously, in order for the iron to bind appropriately, this is, by the way, line 31. Hold on just a little bit. Sure thing. What page is that? It's A2745, Column 3, line 31. As discussed previously, in order for the iron to bind appropriately to the citric acid, the pH should be above 2 and preferably 5 to 9. One difficulty with the addition of base, however, is the formation of emulsions, which can interfere with effective separation. Therefore, the most preferred pH is around 6, especially for naphthenic acid crudes, and the 943 is dealing with these naphthenic crudes, which are the heavier ones. And so what it's teaching there actually with respect to the acid in this is that you don't want it to go too high, and it says the preference is at 6, and it can go down even lower. What about the formation of emulsions being a problem? Yeah, and that's an interesting issue. It jumps out at one as saying, wait a second, this entire process, they talk about desalters, they talk about emulsifiers in here, they talk about intimate mixing. Those are all things that are talking about the emulsion that are made in the conventional desalting process. So why is there that sentence? And what the board found, and it's supported by all the evidence I just said and also maybe even a reading of this sentence itself, is this is talking about a very particular form of emulsion, what they called a stable emulsion, and you see that in some of the other references that we have. For example, petroleum refining, and I believe page 55 of that reference talks about these stable emulsions. And those are difficult because if you mix things up, you want to make sure that at a certain point you can separate them. And so in this particular circumstance, especially with these heavy, heavy naphthenic crudes, which are these heavier crudes that are harder to resolve, if it gets too base, and this is my understanding, it gets kind of milky and difficult to demulsify at the end of the process. So looking at all this evidence that I just named, the board actually said, no, this is a very particular emulsion that they're saying is not desirable. But of course, when you're talking about using conventional desalting processes, we know from a number of different prior sources in this, you are going to be doing an emulsion. That's the entire point of this, to bring the mix of the oil and the water together with a solution, and then after you process it, then to separate it back into a water and oil phase. So I think on that issue, I've given you the evidence, but the board itself's findings on that, which is a reading of the prior references. I'm sorry, your opponent says that Hickok is not an analogous reference because it deals with gasoline. Yes, that's right. So I just want to add, with respect, that's another combination that, for us, Hart and Reynolds themselves, that combination is the one that kind of gets you there. But the Hickok, I think, if you look at your recent decision in the Applebee's Samsung case, talked about some of these analogous art issues, and I think it's pertinent here. We are talking right now about Hickok, the problem that we solved is removing metals from gasoline. Here we're talking in the 943 patent about the problem we solved is removing metals from hydrocarbons. And so gas is a hydrocarbon. The 943 patent talks mostly about crude oil as examples, but I counted 50-some references to hydrocarbons generally in there. There's many benefits of the invention that are listed that are around liquid hydrocarbons. So the idea that gasoline is a liquid hydrocarbon. So I think we're in an area where, under either of the analogous art tests, are we in the same field of endeavor? I would say we absolutely are. Gas, at the end of the day, is a fraction of crude oil. So it is actually, gas is a component part of crude oil. And when it's separated in this process down the road, it can become fuel. But we're talking about the same, potentially the very same hydrocarbon at the beginning and the end of the process. So for me, that's the same field of endeavor. What the board focused on was the, you know, looking at is the same problem to be solved? Is the structure similar? And again, the same problem to be solved, removing metals from liquid hydrocarbons. And the structure is very similar. In Hickok, the structure is to treat this particular fuel with a hydroxy acid and then distill, sending your spent acid down one pipe and your good fuel down the other pipe. So the structure is very similar. And if you just look recently at the Apple case, you see a very similar analysis using that principle. To make the record clear, then, when you responded to, at the beginning of your response to Judge Reyna, when you began by saying, yes, that's right, you were referring to, yes, Hickok deals with gasoline, not, yes, the other clause of his question, which was, they say it's not analogous. I'm only agreeing with the part that's favorable to me, Your Honor. To be clear, yes. No, but I think, and I've given my reasoning, and I think that's sound. And again, the board, this is the board's job. It looks at these issues. It had a nice discussion. It pointed out Hickok itself, you know, it looked at the prior references that treat gasoline and oil the same, and it made that conclusion, and they're entitled to deference. I think the one thing I would raise right now in terms of the claim construction issue that was raised by my colleague, I think it's important on the claim construction, we have the position that there was absolutely a waiver of challenging the claim construction of emulsion. And so we've had that position in there. We also think that that definition is uncontroversial, and it is the broadest reasonable construction. I think it's important, just if there's any doubt in your minds, that even if we took their construction, the construction that it is very specifically a desalting emulsion that's used with a mixed valve, in which there is a certain percentage, I think they say 3% to 10% ratio of water to oil, that very specific new construction they have, the interesting thing is Reynolds still meets it. If we go through Reynolds has this teaching about a certain kind of emulsion it doesn't want, but if you accept that finding, then again and again in Reynolds, there's a teaching of an emulsion that is a thorough and intimate mixture in a conventional desalting process, which we know involves a mixed valve. And it talks specifically at one point about the ratio that they would, this is again in column 3, A2745, line 38. The ratio of aqueous citric solution to hydrocarbonaceous feed should be optimized, the determining factor being the separation method. So it's talking about a number of separation methods potentially. Commercial desalters, for example, ordinarily run at 10% or less aqueous volume. So all the elements of their proposed construction are actually taught very specifically in Reynolds. So in a certain way this argument about the construction is somewhat academic, because even if we were to accept their construction, Reynolds would meet it. And it's also further academic because of course Reynolds is in combination with Hart. So if there's any question about whether emulsion is taught by Reynolds, or what kind of emulsion is taught by Reynolds, I would propose that the most narrow form of emulsion is taught. But if there's any question whatsoever, it is in combination with Hart. And so the board looked at Hart, and if you look at Hart, it's specifically teaching water and oil emulsion, and it's specifically talking about I believe a 5% to 10% ratio. So in my view, that's why I go back to this combination, it's just airtight. Both Hart and Reynolds on their own are very powerful. Together it doesn't seem like there's any difference whatsoever from our point of view. Thank you very much. Thank you very much. Ms. Shield, you have a couple of minutes. Thank you, Your Honor. First I'd like to look at Reynolds and Hart. When you look at Reynolds, Reynolds says that a desalter should use 10% or less wash water. But when you actually look at the experiments in Reynolds, they're shown in the tables, 1, 2, 3, and 4, it uses 50% aqueous solution, 16%, 66%, way above what a desalter runs at according to Reynolds. Additionally, Hart teaches that it's superior to the Reynolds product by adding the acid directly to the oil as opposed to the wash water. Reynolds and Hart by themselves would not lead to a combination by one skill in the art. They are going in different directions. The only way you get there is by using the 9-4-3 patent as a roadmap. The argument about Hickok being an analogous art, this is very similar to the Clay case, where the art that was being cited was a bladder in the bottom of a tank and gel being put into a well formation. They both dealt with handling crude oil in that case, but one was storing it and one was getting it out of the ground. Hickok adds metals to the gasoline for the stabilization process and then in a separate step removes it. But Hickok doesn't use wash water, desalters, or emulsions. Hickok is dealing with a very specific adding metals to gasoline for stabilization. Are you saying that Hickok doesn't use wash water? It does not. It uses an aqueous solution with the acid so the acid can be added to the oil. That's what it is. It's not wash water. It doesn't mention wash water. In the 9-4-3 patent, the issue is removing metals from crude oil that are naturally existing. It's not adding something to remove it. Why isn't the hydroxy aqueous composition there, the wash water plus the hydroxy acid? Because wash water in a refinery has a very specific meaning. It's not water in the sense of what you get out of your tap. That's very expensive. Wash water is whatever water the plants have, and it's used to clean the oil in the desalting process, but it's not pure water. As discussed at 8-4-3-7-8, page 13 of the Appellate's Brief to the Board, wash water is a term of art understood by a person of skill in the art that contains contaminants. It's not pure water, whereas when you're making an acid solution, you're putting it into pure, clean water, and that's the difference that's being overlooked here. Wash water is important, and that's why we go back to lowering the construction of the PA for the wash water. The Board, by removing wash water from the claim language, rewrites the claim scope to be something completely different. Well, in response to Judge Stoll's question, which was why isn't aqueous citrus solution wash water, you said, well, wash water is water with a contaminant in it. I'm sorry. Isn't the citric acid, in your analogy, a contaminant? No, the citric acid is what you're trying to put in in the aqueous solution.  Wash water is a large volume of water that's being mixed with the crude oil. The acid is a smaller subset that's added to the wash water before the wash water is added to the crude oil to create the emulsion and the desalting process. The 943 patent talks about the difference between wash water and the solution that's made for the invention, and unfortunately I can't find that site right now. But finally, the secondary considerations of non-obviousness. The Board didn't actually consider the secondary considerations. Specifically, the Southern District of Texas found that NALCA was copying the claimed invention after a two-day preliminary injunction hearing with witnesses. The Board doesn't even address it. The Board also fails to look at the fact that the assignee of the Reynolds patent, Chevron, was one of the two companies that came to Baker to solve the problem with the high-calcium crude oil. And when you look at those issues, they— I don't think that your opponents address secondary considerations. Okay. So don't argue that on— Okay, Your Honor. I see my time's out. Are there any other questions by the Board? Do you want to have a concluding thought? Baker believes, for all the reasons addressed in our brief, that the Board's conclusions of Iverson's Court are inappropriate and should be reversed by this panel. Thank you. Okay, thank you very much. We thank all the parties for their arguments, and this Court now stands recessed. All rise. The Honorable Court is adjourned from day to day.